11:33:17

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA ) 21MJ4100
)
vs.
Buffalo, New York
RAEKWON GREEN, ) July 29, 2021
Defendant. 1:30 p.m.
- - - - - - - - - - - - - - - - - - X

**DETENTION HEARING**
**Transcribed from an Electronic Recording Device**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MARIAN W. PAYSON
UNITED STATES MAGISTRATE JUDGE

JAMES P. KENNEDY, JR., ESQ.
United States Attorney
BY: BRETT A. HARVEY, ESQ.
Assistant United States Attorneys
100 State Street
Rochester, New York 14614

MATTHEW R. LEMBKE, ESQ.
Cerulli, Massare & Lembke
45 Exchange Boulevard, Suite 925
Rochester, NY 14614

J. Cannito, USPO

**COURT REPORTER: Karen J. Clark, Official Court Reporter**
**Karenclark1013@AOL.com**
**100 State Street**
**Rochester, New York 14614**

USA VS. R. GREEN

P R O C E E D I N G S

*   *   *

09:08:00
09:08:00
14:11:03 THE CLERK: United States of America versus Raekwon Green, 21-MJ-4100.

11:33:30 MAGISTRATE JUDGE PAYSON: I received a pretrial services report. It does recommend Mr. Green's continued detention.

11:33:35 Mr. Lembke, did you see that report.

11:33:38 Mr. LEMBKE: Yes, I received it and I read it.

11:33:40 MAGISTRATE JUDGE PAYSON: Mr. Harvey, did you see the report?

11:33:42 MR. HARVEY: I have, Judge.

11:33:44 MAGISTRATE JUDGE PAYSON: Both parties prepared to proceed?

11:33:46 Mr. LEMBKE: Yes, your Honor.

11:33:47 MAGISTRATE JUDGE PAYSON: Mr. Harvey, go ahead.

11:33:49 MR. HARVEY: Your Honor, the government has moved to detain the defendant on both grounds of risk of flight and risk of danger to the community. As your

11:33:58 Honor indicated, a pretrial report has been issued and recommends detention on both grounds. The government agrees with those recommendations. As for reasons, I will explain here and in a few moments.

11:34:25 All of the 3142 (g) factors in this case strongly favor detention of this defendant pending trial. And I would note, as I did when I first moved to detain the defendant, and that part of our argument will rely on the rebuttable presumption based on the 924(c) charge upon a finding by the Court that there is probable cause to believe that charge has been made out.

11:35:51 So, the first factor, your Honor, is the nature and circumstances of the offenses charged. The charged offenses, as your Honor is aware, involve attempted Hobbs Act robbery and possession and brandishing of a firearm during and in relation to a crime of violence. Both of those offenses are exceptionally serious. The severity of those offenses is exemplified by the penalties that both of those offenses carry. The robbery charge itself carries a maximum penalty of 20 years imprisonment, and the firearms charge carries at least seven years of imprisonment up to life consecutive to the robbery charge. Clearly these offenses, just by looking at the

statutes, are exceptionally serious. But, I further state that the circumstances of this particular offense demonstrate how serious these offenses are. And as detailed in the Criminal Complaint affidavit, the charges relate to a violent home invasion robbery that occurred at 331 Conrad Drive on March 22nd, 2020. At the time of the robbery, there were two adult occupants, a female who I'll refer to during this hearing as "Victim 1," and a male who I'll refer to during this hearing as "Victim 2," and two teenage children were present inside the residence. Victims 1 and 2 both describe three black males entering the residence all wearing masks and dark clothing, and two of whom were carrying and brandishing handguns. They indicate that these three black males entered the residence, held them at gun point, searched the house for drugs and money and property and eventually stole personal property and cash before fleeing the residence. Victim 1 states that one of the perpetrators of this offense surprised her from behind in the kitchen of the residence, put his hand over her mouth and told her to be quite. Two of the other perpetrators in the case told her or said at some point, words to the effect, "give me the shit," and "you know what we want," which, she understood to mean that

                          they were looking for drugs and money. Victim 1 admitted that one of her brothers is involved in drug trafficking and was present at the house earlier that day and that is what led her to the conclusion that the perpetrators were looking for drugs and money when they entered the residence. According to Victim 1, the perpetrators eventually took personal property consisting of a cell phone, jewelry and a video gaming system during the robbery. Victim 2, who was also involved in the drug trade, as evidenced by the Criminal Complaint where I note that Victim 2 had been convicted in Federal Court of narcotics conspiracy charges recently, he was playing video games when he was surprised by someone putting a gun in his face. Three of the perpetrators, according to Victim 2, were involved. I'll refer to them as "suspect one," "suspect two" and "suspect three," because Victim 2 was able at least differentiate some of the suspects by some personal characteristics. Victim 2 states that suspects two and three were armed with handguns during the robbery, that one of the perpetrators, referred to as "suspect three," initially held Victim 1, Victim 2 and the two teenage children at gun point in a downstairs bedroom while suspect one remained in the kitchen and

suspect two searched the house for drugs. Victim 2, during the robbery, heard another individual on speakerphone giving directions to suspect two as he searched the house. At one point, suspect two tied Victim 2's hands behind his back and took him through the house to assist in the search for drugs and money. When they went to search and upstairs bedroom, suspect two said, in sum and substance, "if it ain't here, I'm going to do you."

MAGISTRATE JUDGE PAYSON: So who was it that tied the hands of Victim 2 did you say?

MR. HARVEY: Suspect two.

MAGISTRATE JUDGE PAYSON: And led him around the house is what your proffer is?

MR. HARVEY: That's right, Judge.

Mr. LEMBKE: I'm sorry. I didn't hear what you said. What was your question?

MAGISTRATE JUDGE PAYSON: Led him around the house was the question.

Mr. LEMBKE: Okay.

MAGISTRATE JUDGE PAYSON: Go ahead.

MR. HARVEY: Yes. And Victim 2 interpreted suspect two's statements to him to mean that suspect two would shoot Victim 2 if the drugs and money were not

11:41:18 found. Suspect one then came upstairs and told suspect 11:41:26 two to shoot victim two if he, meaning Victim 2, did 11:41:32 anything wrong. And as they continued the search, 11:41:38 Victim 2, who was fearing that he was going to be shot 11:41:42 and/or killed, tried to shut suspect one and two in a 11:41:48 bedroom and then ran down the hallway and jumped down an 11:41:52 entire flight of stairs to try and get away. In that 11:41:57 process, victim two broke his leg. But, not withstand 11:42:03 having the broken leg and still fearing for his safety, 11:42:07 he tried to run out the side door of the residence, but 11:42:11 suspects one, two and three caught him and threw him to 11:42:14 the floor. Victim 2 stated that he was also pistol 11:42:21 whipped during the robbery and had approximately $2100 11:42:25 in cash taken from him, which he has described as the 11:42:28 proceeds of the sale of a vehicle that he had recently 11:42:35 sold to somebody else. Victim 1 did not identify the 11:42:41 defendant in a photo array as we noted in the Criminal 11:42:46 Complaint. We submit that is not surprising considering 11:42:49 the fact that this defendant as well as the other two 11:42:52 perpetrators who entered the house were wearing masks at 11:42:57 the time of the robbery. But, your Honor, those facts 11:42:59 and circumstances conveyed by victims one and two show 11:43:05 that the nature and circumstances of this offense weighs 11:43:09 very strongly in favor of detention. The defendant and

11:43:12 his accomplices created a dangerous and life-threatening situation for Victim 1, Victim 2 and the two teenage children. And, frankly, from my perspective, this case is one step away from an assault one shooting or, worse, homicide.

11:43:41 With respect to the weight of the evidence, Judge, the evidence in this case is strong. I've laid out a lot of the information relating to this particular robbery in the Criminal Complaint. I shouldn't say I did, but the affiant, Agent Martineck. And I can state that as you can see, there was information from one cooperating witness in the Complaint affidavit who I've referred to as CW 1, cooperating Witness 1. Cooperating Witness 1 is currently in a cooperative posture and is cooperating with the government, obviously, in hopes of obtaining some sort of reduced sentence or disposition. But cooperating Witness 1 provided a detailed account of the robbery of 331 Conrad Drive on March 22nd, 2020. He identified Witness 1 from the affidavit as the individual who arranged the home invasion and drove them to the home invasion. He identified this defendant, who he knew as "Bundles" or "Bundy" as one of the perpetrators who entered the house during the home invasion. And he identified, albeit, at one moment,

11:45:34 Judge, he also identified the third individual who entered the house in a photo array, although I would just like to state exactly what he said about that because it's not quite precise. He was shown a photo array and identified the other perpetrator saying the person in the photograph looked familiar and stated, "I think that is the cowboy," the individual he referred to "Cowboy," "the guy from Greece. I don't know his name, the beard did it for me." The individual he identified in that photo array is another cooperating witness in this case who has confirmed his presence as the perpetrator who entered the house. I'll refer to that cooperating witness as CW 2. CW 2 has entered a plea and cooperation agreement with the government and is currently in a cooperative posture. In proffers with the government, CW 2 has admitted his involvement in the home invasion, identified Witness 1 as the individual who arranged the home invasion and drove the perpetrators to the scene of the home invasion, identified CW 1 as being one of the perpetrators of the home invasion, and, also, eventually identified this defendant as being the fourth perpetrator of the home invasion. And I would like to explain the circumstances of that identification, Judge, just so the record is

USA VS. R. GREEN

11:47:16 clear. In an initial proffer session with CW 2, like I said, he admitted his role in the home invasion at 331 Conrad Drive and stated four people involved; three people that entered the house and Witness 1 who entered the house and stayed outside. In the course of that proffer, CW 2 was shown a photo array containing a photograph of this defendant, and CW 2 identified this defendant and said he recognized him or said he "looked like the guy that went to the home invasion with CW 2 and Witness 1, from the affidavit, "near a firehouse in Webster." And I say that, Judge, because in other parts of this proffer, CW 2 explained or described a different home invasion robbery that occurred near a firehouse in Webster and he states that Witness 1 from the Complaint Affidavit and this defendant were involved in that home invasion as well. CW 2 stated that he did not know the defendant's nickname, but he said that Witness 1 referred to him as "Lil Mans," and CW 2 stated that he was not 100 percent sure, but that it definitely looked like him. And I should note, Judge, that this proffer occurred during the pandemic and it was done via WebEx, so the photo arrays that were shown to the witness were shown over a computer screen.

11:49:06 In a subsequent proffer in early February of

this year with CW 2, the investigative team spoke again with that individual. And during that proffer, the investigator showed CW 2 the same photo array in which he previously identified the defendant as being involved in a separate home invasion and asked CW 2 if that person did any other home invasions or what he refers to as "licks" with CW 2. And at first, CW 2 stated that he did not. But then later in the proffer session, he recounted the home invasion at 331 Conrad Drive and did say that there were four perpetrators, including Witness 1, CW 1, and he said that the fourth perpetrator was one with a brush cut who was the same guy from the home invasion near the firehouse, referring to the home invasion near the firehouse in Webster. And he did state that the guy from the firehouse, meaning the defendant, had a compact gun during that particular property.

MAGISTRATE JUDGE PAYSON: Which particular robbery?

Mr. LEMBKE: Which particular robbery?

MR. HARVEY: What's that?

MAGISTRATE JUDGE PAYSON: Which particular --

MR. HARVEY: 331 Conrad. So, Judge, there

11:54:21 are two cooperating witnesses at this point who describe 11:54:24 what happened during the home invasion at 331 Conrad as 11:54:28 well as two victims that describe what happened. Two 11:54:30 witnesses, at this point, identify this defendant as 11:54:33 being one of the perpetrators. I would note that the 11:54:39 complaint affidavit does layout information from Witness 11:54:43 1 who was also involved in the home invasions, the home 11:54:48 invasion, excuse me. As we state in the affidavit, 11:54:54 Witness 1 had entered a proffer agreement with the 11:54:57 government and provided extensive information about this 11:55:00 home invasion as well as others. But I want to say for 11:55:05 the record, because I didn't reference this in the 11:55:06 affidavit, he is not currently in a cooperative posture. 11:55:10 But the information that he did provide in those proffer 11:55:14 sessions were, obviously, consistent with the 11:55:18 information provided by CW 1 and CW 2. Witness 1 11:55:24 specifically identified three individuals who 11:55:28 participated in the home invasion and each of those 11:55:31 individuals are CW 1, CW 2.

11:55:34 MAGISTRATE JUDGE PAYSON: So let me ask you 11:55:37 a question about CW 1. When you say he is not in a 11:55:40 cooperative posture, have you determined that CW 1 has 11:55:45 provided you information which was not accurate?

11:55:51 MR. HARVEY: No. And, Judge, for the record

W 1.

MAGISTRATE JUDGE PAYSON: I'm sorry, W 1.

MR. HARVEY: I know.

MAGISTRATE JUDGE PAYSON: I was with you. Witness 1.

MR. HARVEY: Yes, Witness 1.

MAGISTRATE JUDGE PAYSON: You have not made a determination not to engage in further cooperation with Witness 1 because you determined that he was not credible?

MR. HARVEY: That's correct, Judge. That's correct, Judge, that is not the case.

MAGISTRATE JUDGE PAYSON: It's for some other reason?

MR. HARVEY: Yes.

MAGISTRATE JUDGE PAYSON: Not having to do with credibility.

MR. HARVEY: That's correct, Judge.

MAGISTRATE JUDGE PAYSON: Okay.

MR. HARVEY: So, Judge, I know it got a little convoluted because of the circumstances, but I submit to you, the weight of the evidence in this case is reasonably strong and there is a substantial chance of the government prevailing at trial were the defendant

to be indicted for the two offenses alleged in the Complaint.

With respect to the defendant's personal characteristics, the Pretrial Services Report spells out much of his characteristics, and I would like to focus at least on what I view to be the most aggravating of his personal characteristics and that is his criminal history. The defendant is 24 years old. And since the age of 16, he has sustained seven criminal convictions, that is seven convictions over the course of eight years, four of which are felonies, and three of which were misdemeanors. The Pretrial Services Report gives you the details on all of those, but suffice it to say, over the last eight years, the defendant has served several jail and prison sentences for those offenses and it's apparent from not only this case, but also his criminal record, that he is unable to follow the law, to obey the rules and to live a law abiding life. That point is driven home, not just by the number of convictions and the severity of the convictions, but also by the fact that over the course of his criminal career, he has two probation violations as well as three parole violations. That track record demonstrates that he would be unable to abide by any conditions of release

were this Court to impose them. And, more importantly, that he poses a very significant danger to the community were he to be released from custody. I would rely on the Pretrial Services Report for the details unless your Honor would like to hear more about the criminal record.

MAGISTRATE JUDGE PAYSON: Do you have any information with respect to what the nature of the probation violations or parole violations were?

MR. HARVEY: You know, your Honor, I was trying to piece that together from the police reports, but I can't give you a definitive answer on that. I have hundreds of pages of police reports relating to this defendant, and I wasn't able to connect them to the dates that are reflected in here. I certainly would be happy to run that down. I would note that, at least with respect to one of the -- the second violation of probation in November of 2013, that violation of probation led to him being resentenced to prison time from his initial probation sentence. So I would submit that is more than likely not just a technical violation where there is a misunderstanding.

MAGISTRATE JUDGE PAYSON: Okay. But you don't have any specific information?

MR. HARVEY: I don't. I don't.

                              12:00:29 MAGISTRATE JUDGE PAYSON: Okay.

12:00:38 MR. HARVEY: And just to revisit the rebuttable presumption issue, Judge, I think the information provided by victims one and two taken together with the information from CW 1 and CW 2 shows that there is probable cause that this defendant committed a violation of 924(c) by carrying a firearm during and in relation to a crime of violence, possessing it in furtherance of that crime of violence, and brandishing it in furtherance of that crime of violence. So I would ask the Court to apply the presumption in this case. And if you do, the government submits that the defendant, based on the Pretrial Services Report, cannot overcome that rebuttable presumption to show that he would not be a danger to the community or that he would not be a risk of flight. So, based on the proffer, Judge, I would suggest that or I submit that we have shown by a preponderance of evidence that the defendant is a serious risk of flight, and we've shown by clear and convincing evidence that the defendant is a danger to the community if he were to be released from custody.

12:01:48 MAGISTRATE JUDGE PAYSON: You talked about in your proffer, you proffered that Victim 2 was, I

12:01:53 think you said, pistol whipped?

12:01:56 MR. HARVEY: Yes.

12:01:57 MAGISTRATE JUDGE PAYSON: Are you proffering
12:01:58 any information as to the identification of the
12:02:01 individual or individuals whom you say are responsible
12:02:05 for that or perpetrated it?

12:02:10 MR. HARVEY: My recollection, and if I could
12:02:12 have a moment to confirm this. Victim 2 did not state
12:02:48 which of the perpetrators pistol whipped him. Although,
12:02:53 I would state, Witness 1, that is W 1, stated that --
12:03:09 well, first Witness 1 stated that all three of the
12:03:16 perpetrators who entered the residence carried guns,
12:03:20 including this defendant who carried a black 380. And
12:03:24 Witness 1 states that a male inside the residence ran
12:03:29 and broke his leg after Bundy, who was this defendant,
12:03:35 pistol whipped him. So Witness 1 states that this
12:03:38 defendant was responsible for pistol whipping victim
12:03:42 two.

12:04:16 MAGISTRATE JUDGE PAYSON: Okay. Anything
12:04:21 else, Mr. Harvey?

12:04:24 MR. HARVEY: No, your Honor.

12:04:25 MAGISTRATE JUDGE PAYSON: Okay. Mr. Lembke.

12:04:27 Mr. LEMBKE: Your Honor, give me just one
12:04:29 moment, please.

12:08:02 MR. HARVEY: Actually, Mr. Lembke, I'm sorry
12:08:04 it's not apparent from the Pretrial Services Report, the
12:08:07 defendant's first two felony convictions were for
12:08:47 attempted burglary in the second degree. Both of those
12:08:53 involved dwellings and did involve completed burglaries
12:09:00 of residences. The first at 603 Pullman Avenue in June
12:09:05 of 2012, and the second one is at 26 Pearl Street in
12:10:07 October of 2012, during which the defendant and others
12:10:13 that he was involved with entered the house and stole
12:10:17 personal property.

12:10:20 MAGISTRATE JUDGE PAYSON: Okay. Thank you.

12:10:21 MR. HARVEY: You're welcome.

12:10:44 Mr. LEMBKE: I would like to focus your
12:10:46 Honor on really what the principle issue is here and
12:10:52 that is whether Raekwon Green was, in fact, one of the
12:10:59 three perpetrators of this robbery at 331 Conrad Street
12:11:08 on March 22, 2020. There is, in my view, some
12:11:18 significant inconsistency in the versions and
12:11:25 descriptions of the incidents of that evening. I
12:11:29 believe it was that night around 8 or 8:30 at night when
12:11:34 this allegedly happened. And, in that regard, I want to
12:11:41 call to the Court's attention that we have, essentially,
12:11:44 we have three witnesses -- not essentially, we do. We
12:11:48 have three sources of information, we'll call it.

                              Whether they are witnesses or not, I suppose, is a characterization. These are three sources of information, not including the two victims because they've identified what happened in there, but they weren't able to identify the individuals, obviously. Witness 1, based upon my reading of the Criminal Complaint, is a drug user. And the reason I say that is because in the Criminal Complaint under Witness 1's information, the witness admitted to his role in two home invasion robberies, one on Avenue E and one on Wellington Street, and identified co-conspirators who participated in those crimes. And he describes, as I recall it correctly, that the witness told the government that he had to be careful because they were trying to hit a drug dealer's sister's house and that he had to be careful because he was buying heroin from his drug dealer, from this drug dealer. So, and he had a hunch that drugs would be in the house because this drug dealer received heroin about once a month. So, Witness 1 is, seems to me, and I guess the government can confirm this, if they have this information, is a heroin user, a drug addict. Witness 1 is also problematic because as I listened to the government's proffer, seemed to me that the description that Witness 1 was

12:16:54 giving of the other three perpetrators of this crime was 12:16:58 pretty vague. For example, one -- and we would think, 12:17:03 by the way, and as I understand it, this witness was 12:17:07 involved in a number of these burglaries and robberies, 12:17:15 would be familiar with, had an opportunity to observe 12:17:19 the individuals with whom he was allegedly engaged in 12:17:23 this serious criminal conduct. He identified, as I 12:17:26 understand the government's proffer, my client, and as 12:17:33 someone he knew as "Bundy." So, we're talking about a 12:17:37 situation where he doesn't know the person's name, 12:17:44 didn't really give a detailed description of my client, 12:17:53 and, as I understand it, had participated in at least 12:17:57 one, this one, and maybe more of these incidences. And 12:18:03 when it comes to the second person, he fingers, or a 12:18:06 second person that he fingers as being part of this 12:18:13 March 22 second robbery, he is given a photo array and 12:18:20 says "I think that is Cowboy. The beard did it for me." 12:18:27 These are not particularly significant identifications 12:18:29 and I'm not given really with any type of certainty, in 12:18:33 my view, the Court can rely on. Another interesting 12:18:39 thing about Witness 1 is when it comes to this pistol 12:18:45 whipping incident, as I read the Criminal Complaint and 12:18:52 as I understand the government's proffer, what Witness 1 12:18:57 said about pistol whipping is that, first of all, I

USA VS. R. GREEN

should say that Victim 2, the person who is allegedly
pistol whipped, recounts that suspects one, two, and
three caught victim two, threw him to the floor, which I
infer to mean the floor of the home, inside, and that
victim one was pistol whipped during the robbery.  What
Witness 1 says is that while inside the location, the
male occupant of the house ran and broke his leg after
Bundy pistol whipped him.  Witness 1 was not inside the
location.  There is no possible way for Witness 1, as we
understand it, and based upon the government's proffer,
my understanding from reading the Complaint was that
Witness 1 was the driver and waited outside while the
three perpetrators went inside.  So what we have here is
we have a plain statement by Witness 1, clearly making
up information or providing information that he obtained
from some other person, which is hearsay, it really
shouldn't even be in this affidavit.

MAGISTRATE JUDGE PAYSON:  Okay.

Mr. LEMBKE:  So Witness 1 is problematic.
Witness two, no, cooperating Witness 1, as I understand
it, also, identified the two other individuals that went
into the house, one of which he knew, again, as Bundy or
Bundles.  They enter through the back door while W 1
waited outside in the car.  There is a statement here by

                        USA VS. R. GREEN

the confidential Witness 1 that all three men were armed with handguns. There is a statement in the Criminal Complaint from, I believe, Witness 1 that states that two of the three, yeah, suspects, Victim 2 stated, and going down, and I'm at paragraph six, "suspects two and three were armed with handguns." CW 1 was also the one that had difficulty identifying the third individual who entered as that of Cowboy and that the beard did it for him. Confidential witness two --

MAGISTRATE JUDGE PAYSON: I'm a little confused, because I think you said that about Witness 1, so is it Witness 1 or CW 2? Let me ask Mr. Harvey to clarify.

MR. HARVEY: It's CW 1.

MAGISTRATE JUDGE PAYSON: CW 1 is the one that looks at the array and says, "I think that is Cowboy. And the beard did it for me"?

MR. HARVEY: Yes.

Mr. LEMBKE: Right. I'm sorry. I'm sorry.

MAGISTRATE JUDGE PAYSON: No problem.

Mr. LEMBKE: Yeah. Witness 1 says that the three individuals participating in the home invasion were Zay, Bundy and Jeff. And as I understand the proffer, there was only a photo array shown to Witness 1

that was discussed here where he identified my client as being Bundy. I don't know whether you said -- I can't remember if he said he identified the other two from photo arrays or not.

MR. HARVEY: I'll clarify. I didn't say that, but I'm about to.

Mr. LEMBKE: Okay. Go ahead.

MR. HARVEY: In regard to Witness 1, in reviewing the reports, he identified each of the three perpetrators in photo arrays. And he did use the words that are set forth in the Complaint Affidavit. We included only the photo array referenced for this defendant because he is the one charged in this Complaint, but there were photo arrays done for the other two perpetrators as well.

MAGISTRATE JUDGE PAYSON: Okay. Thank you.

MR. HARVEY: And his statement of their names, at least with respect to Zay and Jeff is shorthand versions of their actual first names.

Mr. LEMBKE: So, moving onto Confidential Witness 2 is the most problematic. Because, first of all, Confidential Witness 2 was shown a photo array. I understand it was over video, but, nonetheless, as Mr. Harvey said, this was during the pandemic. So it's hard

to nail that down in terms of time, but clearly closer to the incident than February of 2021. My guess is that it was probably sometime in middle or, you know, of 2020 because that was kind of the height of COVID, but, in any event, the first time around, he didn't identify Mr. Green as being one of the participants in the Conrad Drive incident. In fact, even when it -- when he was trying to identify, I believe it was a photo array of the defendant, Mr. Green, said "it looked like someone that participated in a home invasion robbery near a firehouse in Webster." And I think by that he was referring to Mr. Green and that's a photo of Mr. Green. He didn't identify him as being a participant of Conrad Drive. And then sometime later, we don't know because we don't know when the first attempt at the photo array, he was shown the same photo array as the firehouse in Webster, and, as I understand it, CW 2 said he did not, I didn't really catch what that was, did not see somebody in there. He recounted what happened at 331 Conrad and the four perpetrators and he described the fourth, who I understand to be allegedly my client as someone with a brush cut, the same guy as at the invasion at the home invasion at the firehouse. So, CW 2, and it's difficult, it's really kind of difficult for

                              12:35:15 me to follow, you know, when we're using these "CW 2," 12:35:21 "CW 1" type of nomenclature, but this clearly CW 2's 12:35:28 identification is problematic. And let's just step back 12:35:35 a second. This is not a situation where we're talking 12:35:37 about witnesses who are unknown to the perpetrators who 12:35:41 are victims of crime, who sees people for split seconds 12:35:46 and we're going back now and nitpicking the 12:35:49 identification of whom did what to whom, which took 12:35:52 place in a split second. We're talking about partners 12:35:55 in crime here, people who drove to the place together, 12:35:58 who left the place together, who we could assume had 12:36:01 some sort of relationship, who, as I understand the 12:36:04 proffer as a whole, did have some sort of relationship 12:36:08 in committing other offenses similar to this offense, 12:36:12 and you would think there would be a little bit more 12:36:15 consistency and a little bit more certainty as to the 12:36:18 other individuals with whom they were entering a house 12:36:22 to steal money and drugs and beat people up. So just as 12:36:28 a whole, in general, all of this information is 12:36:30 problematic, in my view, to the Court in determining 12:36:33 whether it's reliable enough to establish probable 12:36:37 cause. And I just want to step back on another point 12:36:43 and say that what I find to be somewhat interesting, if 12:36:49 not remarkable and certainly noteworthy and important

for the Court to consider concerning the government's proffer, it's really a kind of lack of detailed information among the three sources of information, even the five sources of information, the two victims being two of them and then three of the four participants, if you will, the driver and the other two men. It seems to me, Judge, that what has been recounted here is so vague it lacks in substantial detail such that it's kind of information that people can pick up from here or there or piece together or just talk in kind of generalities as opposed to specificity, and there is really not much in terms of specific conduct of any of the individuals that can give the Court, you know, the kind of comfort level in saying, yeah, those are pretty detailed recitations of fact of what happened. Really, what we get here, a bunch of guys went in. The woman was, you know, was grabbed and put a hand over her mouth, they tied the guy up, walked him around, they said bad things to him, the guy tried to run away, and he broke his leg, and somebody hit him and they got the hell out of there, heck out of there, sorry about that. So, in that regard, I think that the government's proffer relates to the weight of the evidence, which I think is the significant thing here because, look, let's face it, I

USA VS. R. GREEN

read the presentence report, and I read all of the violations of probation and all of those violations of parole, and all of those prior convictions. And Mr. Green and I have talked about it, in terms of that, you know, there is not a lot to recommend release here for him. But the problem is, you can't hold a guy in custody if you don't have proof that he done it. And I don't think you have proof that he done it. And that is my proffer.

MAGISTRATE JUDGE PAYSON: Okay. Mr. Harvey, is there anything you want to say in response?

MR. HARVEY: Judge, I guess I'll clarify a few things. I think you can rely on the information from Witness 1. I don't think that, based on my review of the reports relating to his proffers, that he is a drug user. I believe he was getting description quantities from the 331 Conrad Street robbery, so there was no particular indication that that witness was a drug user.

MAGISTRATE JUDGE PAYSON: As opposed to a drug dealer.

MR. HARVEY: Right, right, that is my understanding, Judge. With respect to how he found out this defendant was the one that pistol whipped Victim 2,

12:40:37 the report does not specifically say where his source of 12:40:41 information was for that, but presumably it was in 12:40:44 conversation among co-conspirators because there were 12:40:47 three people in the house who returned to the car with 12:40:50 Witness 1 and fled the area. So, presumably, that was a 12:40:55 subject of conversation. And, I say, I think the Court 12:40:58 can infer that because, how else would Witness 1 know 12:41:02 what happened inside that house? There was no other 12:41:05 connection between Victim 1.

12:41:07 MAGISTRATE JUDGE PAYSON: Well, I can think 12:41:09 of at least one other man or I think Mr. Lembke raises a 12:41:15 valid point here, which is that Witness 1, by the 12:41:24 government's own proffer, didn't go into the house 12:41:27 during the robbery. Somebody, according to the 12:41:31 government's proffer, is giving directions over a 12:41:33 telephone, and, I presume, that that person also may be 12:41:38 hearing what's going on, and, you know, I think that 12:41:45 there are probably different scenarios under which 12:41:49 Witness 1 may have come into that information. Perhaps 12:41:53 one scenario is more reliable than another, and I think 12:41:57 it is a valid question because -- and you didn't proffer 12:42:02 that. I asked you that question, if I'm remembering 12:42:05 that correctly, I don't think you said in your proffer 12:42:09 that the defendant pistol whipped. You said there was a

pistol whipping. And I asked you a question, so I take from that, you were making your proffer without relying on that fact, but I think Mr. Lembke raises a reasonable point as to the reliability of Witness 1's assertion in that respect since we don't have any other information or I don't know, in the Complaint, as to who committed the alleged pistol whipping. And I guess what I think you're also telling me is that Witness 1, who is no longer in a cooperative posture. So you're probably stuck with whatever reports you have in terms of whether you can go back and figure out where you have any information as to where that -- what that was based on, right? You can't go back to Witness 1 because Witness 1 is no longer in a cooperating posture.

MR. HARVEY: Right. I can go back to the investigators and see if they asked him that question.

MAGISTRATE JUDGE PAYSON: Right, right. That is what I'm saying. You may be able to get the information from investigators, but if they don't have it and it's not noted, you can't get that from Witness 1 right now.

MR. HARVEY: I think that is fair to say, Judge. Although I don't know what other source of information Witness 1 would have had because the victims

12:43:35 of the home invasion did not report it to the police for obvious reasons, and my understanding is that Victim 1 and Victim 2 have no relationship with Witness 1.

12:43:46 MAGISTRATE JUDGE PAYSON: Well, isn't it possible that, and we can divorce it from this particular case, but, I mean, we've all seen cases where somebody purports to have information and when you track down what the source of that is is somebody heard it from somebody who heard it from somebody who passes along to somebody else. So Witness 1 may have been in a position to have learned that from the perpetrators, and you're assuming that he did, but it seems to me it's possible that he didn't learn it directly from the perpetrators. And I just think we don't have any information, you know, as to where that came from. Your theory is certainly plausible, but I think there are other plausible inferences.

12:44:38 MR. HARVEY: I understand, Judge. It's certainly possible it came from another avenue. I mean, I can try and find out the answer to that question, first of all. Second of all, even if he did get it from another source, whether or not this defendant or one of the other armed accomplices who entered the house with him pistol whipped Victim 2, I don't think is the most

USA VS. R. GREEN

12:45:06 significant fact here. The fact is --

12:45:08 MAGISTRATE JUDGE PAYSON: That's fine. I asked the question, you didn't proffer it, so I can see why Mr. Lembke would think it's important to raise that issue because it's something that I thought might be important. I understand you're saying that you're not, you're not relying on that.

12:45:25 Mr. Moynihan, we're probably going to be a few more minutes.

12:45:29 So, I think what you're telling me is that you would be moving for detention and indeed you made your proffer without inclusion of that allegation.

12:45:40 MR. HARVEY: I think my proffer continued in responses to the Court's questions.

12:45:43 MAGISTRATE JUDGE PAYSON: No, you're saying there is a basis to detain the defendant irrespective of the pistol whipping.

12:45:50 MR. HARVEY: Right.

12:45:51 MAGISTRATE JUDGE PAYSON: I understand.

12:45:52 MR. HARVEY: But I'm also saying that I'm happy to try and track that down and get that answer to the court if that were material to the Court's decision.

12:45:59 MAGISTRATE JUDGE PAYSON: Okay. Was there something else?

12:46:01 MR. HARVEY: I mean, your Honor, I would state that, you know, each of Cooperating Witness 1 and Cooperating Witness 2, both gave detailed statements about this robbery. And the bottom line is, and I could go into more detail about what they stated chapter and verse, but Victim 1 and Victim 2's facts of what happened inside that house and Cooperating Witnesses 1 and 2 give us the identity of the people that did it, so that is my point.

12:46:38 MAGISTRATE JUDGE PAYSON: Okay. What I would like is information, and I think it probably would come from the government rather than pretrial services with respect to the parole violations. I would like to know what is the basis of those violations when we're talking about parole violations. You know, Monroe County probation violations, I know that is information that pretrial can often provide to me. I'm not sure that is true about parole. So I don't know who has easier access to that information, Mr. Harvey.

12:47:12 PROBATION: Your Honor, we can request parole records. Sometimes we don't get them in a timely fashion.

12:47:19 MAGISTRATE JUDGE PAYSON: That is what I thought. Why don't I ask Mr. Harvey to see if he can

12:47:23 track that down.

12:47:24 MR. HARVEY: Happy to do it, Judge.

12:47:26 MAGISTRATE JUDGE PAYSON: I know there are two pro-operation violations that the government noted and Mr. Lembke acknowledged them, they are in 2013. I'm not saying that that is irrelevant for my purposes because, you know, as the government indicated, and I think Mr. Lembke will acknowledge, looking at the criminal history is not, you know, it's not a particularly compelling showing, by the defense, for release. But, as to the violations of probation, Mr. Green was, you know, relatively young. I'm not -- I don't think we need to go back and find out what the basis of the violations of probation were in 2013, but I am interested in the violations of parole on the subsequent, subsequent convictions. And I would agree, Mr. Lembke. So, you're certainly welcome, you know, if you have any information about any of those violations that you think would be helpful for me to consider, you are welcome to send me an e-mail with a copy to the government and give me any information that you would like to proffer. You're certainly right that that is information the Court considers, and considers fairly significantly, as you know. I don't disagree with you

USA VS. R. GREEN

12:54:56 that, you know, before I get to criminal history, I do have to look at the crime that is being charged here. I am, you know, I'm keenly aware of the requirement that there be probable cause. You know, I'm the Judge who signed the Complaint. I reviewed it carefully, noting some of the observations, frankly, that the defense made. But on balance, determining on the basis of what had been presented to me in the Complaint that a showing of probable cause had been made. But, I don't, you know, I don't disagree with you that I don't get to criminal history, you know, unless I'm satisfied that certainly this is, you know, a crime for which probable cause has been -- has been shown. That was my, my conclusion at the time the Complaint was presented to me, but I certainly would like to think about that issue again in light of the arguments that you've made. But, you know, assuming that I reach that conclusion, the criminal history is significant, so I think if there is anything that you do want to offer on any of -- on any of that, you're certainly welcome to do that.

12:56:19 MR. LEMBKE: I understand. Thank you.

12:56:20 MAGISTRATE JUDGE PAYSON: Okay. I think that is it. I don't have any particular -- I would say, Mr. Harvey, if you do have an answer to what the basis

12:56:31 is for Witness 1's allegation, I would welcome your telling me that. If Mr. Lembke wants to respond in any fashion, of course, he may. He is not required to do that. Okay. So I'm going to reserve on this motion and await further information from the government. And, Mr. Lembke, you know, at some point after you receive information from Mr. Harvey, if you would be kind enough just to let me know do you want to respond or not.

12:57:10 Mr. LEMBKE: I will.

12:57:11 MAGISTRATE JUDGE PAYSON: What would you like to do about a preliminary hearing or a further status conference?

12:57:16 Mr. LEMBKE: We would like to schedule a preliminary hearing.

12:57:20 MAGISTRATE JUDGE PAYSON: Okay. My recollection is that we were in here on Monday was the day he was arrested and appeared, which was the 26th, is that right?

12:57:43 MR. LEMBKE: July? Yes.

12:57:50 MAGISTRATE JUDGE PAYSON: Yes. And you said you wanted to address the preliminary hearing today. So I think we count from today, not Monday.

12:57:56 Mr. LEMBKE: Well, okay.

12:57:58 MAGISTRATE JUDGE PAYSON: Fourteen days,

12:57:59 and, I mean, generally, I ask, do you want to address the issue of a preliminary hearing today or on Thursday.

12:58:06 Mr. LEMBKE: All right. I mean, we're talking about, you know, three days, but, still, I think the statute says that it's not later than 14 days after initial appearance. So I don't know.

12:58:18 MAGISTRATE JUDGE PAYSON: It is, unless, and I say, do you want to schedule a preliminary hearing at the initial appearance, and if the issue is I would like to address that on Thursday, then, I've always understood, and I think others have understood that that means you're not going to come in on the 13th day and say, okay, now I want to have it tomorrow.

12:58:39 Mr. LEMBKE: I guess I understand.

12:58:42 MAGISTRATE JUDGE PAYSON: But, you know, if it doesn't matter to Mr. Harvey, I don't, you know, I'll put it on for the 9th. Judge Pedersen will handle it, in any event, because I won't be here. So, do you want it on the 9th? Can you present next week if that is what --

12:58:59 MR. HARVEY: I'll be presenting next week, but I would like the full 14 days, please.

12:59:03 MAGISTRATE JUDGE PAYSON: Well, I suggest that you go back and listen to the recordings and I

USA VS. R. GREEN

think that, unless Mr. Lembke is telling me that he is satisfied with the 12, I don't want to have any argument that it should have been on the 9th rather than the 12th. My understanding was that the issue of the preliminary hearing was going to be addressed today and the period of time from Monday to Thursday would not count. But --

MR. HARVEY: That was my understanding, too.

MAGISTRATE JUDGE PAYSON: But, as you know, I've had so many appearances in the last two weeks. I don't recall the record.

MR. HARVEY: This would be a first in my experience if counsel were to retroactively start clocking that. I'll double check the recording, but that is my understanding.

MAGISTRATE JUDGE PAYSON: With that understanding, I'll put it on for August 12th. And I'm going to put it on at 2 p.m. on August 12th. I will send an e-mail to Judge Pedersen and confirm his availability for a preliminary hearing.

I assume, Mr. Harvey, that you're going to present the case to the grand jury?

MR. HARVEY: Yes, that's right, Judge.

Mr. LEMBKE: Your Honor, I have an another

13:00:16 appearance in court on at 2:30 on the 12th, city court. 13:00:26 I can adjourn that.

13:00:29 MAGISTRATE JUDGE PAYSON: What? He is not 13:00:37 in that day?

13:00:39 THE CLERK: It looks as though he is out.

13:00:41 MAGISTRATE JUDGE PAYSON: Sorry, Mr. Harvey. 13:00:42 I'm going to go to the 11th since Judge Pedersen is 13:00:46 evidently not here on the 12th. 2 o'clock on the 11th. 13:00:53 Okay? I'm reserving on the government's motion for 13:00:55 detention. We'll put this on for a preliminary hearing 13:00:59 on August 11th at 2 o'clock. Anything else?

13:01:06 MR. HARVEY: No, your Honor.

13:01:07 Mr. LEMBKE: Judge, I do. Well, I did want 13:01:09 to address one thing. I don't think, however, that as I 13:01:12 understand it, the running of this detention hearing and 13:01:17 the running of the preliminary hearing do not affect the 13:01:21 timing of when the government would have to bring an 13:01:26 indictment, which I think is 30 days from the day of the 13:01:29 defendant's, of his arrest. Do you have a different 13:01:34 position on that?

13:01:37 MR. HARVEY: The way we handle it is it's 14 13:01:40 days for somebody in custody and, yes, it would be from 13:01:43 the day of arrest, if you were to request the PH on that 13:01:47 day.

13:01:48 MAGISTRATE JUDGE PAYSON: No, I'm talking about the indictment, the 30 days you have to indict him under 3161(b).

13:01:55 MR. HARVEY: It's 14 days. I would love to have 30 days.

13:01:59 MAGISTRATE JUDGE PAYSON: No, Mr. Harvey, I believe, is incorrect. There is a 14-day period for a preliminary hearing. But the defendant doesn't have a preliminary hearing if he is indicted first. So as a practical matter, in cases in which an in-custody defendant reserves the right to a preliminary hearing, the government is likely to present the case to the grand jury and secure an indictment within that 14-day period. If the government secured an indictment on the 29th day, that would be consistent with the speedy trial clock, although it would be a violation of the preliminary hearing rule if there had been a preliminary hearing requested. So I think they are two separate rules with separate clocks.

13:02:45 Mr. LEMBKE: Correct. For example, I suppose if it went according to all of the rules, we would have a detention hearing, you know, within whatever number of days, preliminary hearing within 14 days. If the Court found probable cause to hold the

                        13:02:59 defendant, they would have 16 days from then to indict.

13:03:02 MAGISTRATE JUDGE PAYSON: I think that is right.

13:03:04 Mr. LEMBKE: Follow me? I'm talking about --

13:03:07 MR. HARVEY: I got you.

13:03:08 Mr. LEMBKE: And the time if we have hearings it doesn't move the time back it starts from back there when he was first arrested, the 30-day time period.

13:03:17 MAGISTRATE JUDGE PAYSON: There has been a speedy trial exclusion by virtue of the pendency of the government's motion, so that may affect the speedy indictment clock.

13:03:27 Mr. LEMBKE: All right. Okay.

13:03:29 MAGISTRATE JUDGE PAYSON: In any event, I think the government has said it intends to present the case to the grand jury, so we'll see.

13:03:37 Mr. LEMBKE: Okay.

13:03:38 MAGISTRATE JUDGE PAYSON: Thank you.

13:03:38 Mr. LEMBKE: Yes, thank you.

* * *

CERTIFICATE OF REPORTER

USA VS. R. GREEN

I certify that the foregoing is a correct transcript of the record to the best of my ability of proceedings transcribed from the audio in the above-entitled matter.

S/ Karen J. Clark, RPR

Official Court Reporter